Rockingham, }
June, 1896. }

## FOLSOM, Adm'r, v. CONCORD & MONTREAL RAILROAD.

68  454
70   83
70  128
70  213
70  363
70  447

68  454
71  432
68  454
72  210
72  372
72  374

68  454
f74 130
f74 132
74  133

In an action against a railroad for causing the death of a traveler at a highway crossing in the compact part of a city, evidence that there was no flagman stationed at the crossing, and that the train was running at a high rate of speed, which was not diminished after the dangerous situation of the traveler was discovered, is sufficient to warrant a finding of negligence on the part of the defendants.

One suddenly put in peril and compelled to choose upon the instant between dangerous alternatives is not chargeable with negligence, as matter of law, for an error of judgment in adopting the most hazardous course.

The creator of a dangerous situation is liable to one who could not escape therefrom by the exercise of due care, although unable to prevent the injury after discovering the latter's peril.

Upon the question of the probable behavior of a horse when in proximity to an approaching train, evidence of the conduct of other horses under similar circumstances is admissible.

CASE, for negligently causing the death of George F. McMurphy, the plaintiff's intestate. Trial by jury and verdict for the plaintiff.

February 13, 1891, McMurphy, while riding in a sleigh drawn by one horse, was struck by the defendants' locomotive engine at the Massabesic-street crossing in East Manchester, and so injured that he died. The crossing is in the compact part of the city. At the crossing and for a long distance easterly of it both the railroad and the street run nearly east and west, making with each other at their intersection on the crossing an acute angle. Opposite the crossing, and abutting upon it, Cypress street opens, leading southerly. A large shoe factory building stands on the easterly corner of that street and Massabesic street. The defendants have a side track extending along by the building and between it and Massabesic street. At the time of the accident the street was icy. The snow had been plowed out of the traveled path to the width of eight or ten feet, and shoveled up from the road toward the side track and from the side track toward the road, making a hard ridge or bank between the street and the side track. A flat car and a box car stood on the side track, one near each end of the factory building. There was a depression in the street at the crossing caused by removing the snow from the track. At a point 593 feet easterly of the crossing there was a pile of sleepers by the side of the railroad. Jewett street, leading southerly, intersects with Massabesic street

at a point 393 feet easterly of the crossing. From the crossing nearly to Jewett street there was a bank wall between the railroad track and the street. McMurphy and the defendants' train were both going westerly towards the crossing. At the whistling-post, eighty rods distant from the crossing (at which point the train was, by reason of a curve, out of McMurphy's sight), the whistle was properly sounded, and thence to the crossing the bell was continuously rung. There was no flagman at the crossing.

The plaintiff's evidence tended to show that the train was running thirty to thirty-five miles an hour (forty-four to fifty-one feet a second), and did not slacken its speed until McMurphy was struck; that McMurphy's horse was somewhat afraid of the cars, requiring considerable effort to control him when near them, though he never became wholly unmanageable; that when the train reached the pile of sleepers an alarm was blown upon the whistle; that this was the first intimation McMurphy had of the approaching train; that until this time he had been driving at the rate of five or six miles an hour (seven to nine feet a second); that he was then nearly opposite the easterly end of the factory building and some 100 to 120 feet from the crossing; that the traveled path of the street was at this point twelve to fifteen feet from the railroad track; that at the sound of the alarm McMurphy turned his head, appeared to see the train, swung his whip, urged his horse to greater speed, and drove directly upon the crossing; that the engine struck the back of the sleigh about six inches from the left-hand corner; that the horse exhibited no signs of fright till he reached the crossing, and was not then at all unmanageable; that on account of the cars on the side track, and the ridge or bank of snow, it was not possible for McMurphy to turn into Cypress street without going upon the crossing. The defendants' motion for a nonsuit was denied and they excepted.

A witness for the plaintiff (found by the court to be qualified for the purpose) was permitted to testify, subject to the defendants' exception, that a train coming from the rear would be more likely to frighten a horse than one approaching him in front, and that the horse would be likely to manifest more fright when the train was opposite him.

The court declined to instruct the jury that "if the jury find that McMurphy consciously drove in front of the approaching train, his administrator cannot recover of the defendants, unless the defendants, after discovering McMurphy's danger, might have prevented the accident by the use of ordinary care," and the defendants excepted. They also excepted to instructions given as follows: "If you find McMurphy was put in sudden peril in consequence of the negligence of the defendants, or for any reason for which he was not responsible, and adopted a course which in ordinary circumstances a prudent person would not have adopted,

he is not necessarily chargeable with negligence; but the test is, would an ordinarily prudent person under the same circumstances have done as he did."

*Greenleaf K. Bartlett* and *Edwin G. Eastman*, for the plaintiff.

*Frank S. Streeter* (with whom were *Joseph W. Fellows* and *John S. H. Frink*), for the defendants. We desire to call attention to two questions: (1) The admission of the so-called expert testimony; and (2) the motion for a nonsuit.

Subject to exception, the witness testified that a train coming from the rear would be more likely to frighten a horse than one approaching him in front, and that the horse would be likely to manifest more fright when the train was nearly opposite him. This was not an opinion based upon the witness's observation of the transaction or thing in controversy, and so does not come within the New Hampshire rule on that subject. *Hardy* v. *Merrill*, 56 N. H. 227, 241. It was an opinion based upon the witness's general knowledge and experience. It was expert testimony, or it was nothing. With all its liberality, we do not understand that the New Hampshire rule goes to the extent of permitting non-experts to give opinions based upon facts learned from the testimony of others. In order to entitle one not an expert to give his opinion, he must have personally observed the transaction as to which he testifies.

Our objection to the testimony is that it was not given on a question which is a proper subject for such evidence. "Upon subjects of general knowledge which are understood by men in general, and which a jury are presumed to be familiar with, witnesses must testify as to facts alone, and the testimony of witnesses as experts merely is not admissible." *Jones* v. *Tucker*, 41 N. H. 546, 547. This fairly states the general rule. How has it been applied by the courts? In *Concord Railroad* v. *Greeley*, 23 N. H. 237, it was held that the question of the effect of a railroad passing through a farm was not a proper one for such testimony. "The testimony of experts that leaving a dwelling house unoccupied for a considerable time was an increase of risk was rightly rejected," as it "was a subject within common knowledge." *Luce* v. *Insurance Co.*, 105 Mass. 297. To the same effect are *Mulry* v. *Insurance Co.*, 5 Gray 541, and *Thayer* v. *Insurance Co.*, 70 Me. 531, 539.

Whether placing staves upon the top of an arch to dry is a safe way to use a dry-house (*White* v. *Ballou*, 8 Allen 408); whether a sleigh runner crossing a track at a certain angle could have been caught (*Tuttle* v. *Lawrence*, 119 Mass. 276, 279; *Patterson* v. *Colebrook*, 29 N. H. 94); whether a boat was hung in such a position that it would be manifestly unsafe to get into it

(*Simmons* v. *Steamboat Co.*, 97 Mass. 361, 371); whether a brush fire set in a certain way would probably spread (*Higgins* v. *Dewey*, 107 Mass. 494, 496); whether a certain construction of a building increased the risk of fire (*Insurance Co.* v. *Cotheal*, 7 Wend. 72, 77, 79); whether a building is so situated as to be likely to communicate fire to another building (*Railroad* v. *Kellogg*, 94 U. S. 469, 472, 473); whether a fence was sufficient to turn stock (*Enright* v. *Railroad*, 33 Cal. 230; *Sowers* v. *Dukes*, 8 Minn. 23), are not questions for expert testimony.

The question here is not as to the admission of the opinion of a witness based upon what he saw, but as to what is a proper subject for expert testimony. If the facts considered in the foregoing cases are matters of common knowledge, it seems to us that the effect upon a horse of a railway train approaching from the rear must be equally so.

This evidence was introduced, not to show that the horse was frightened, but to create a situation which might account for what the decedent did. It was offered " as bearing upon the action of Mr. McMurphy as exercised there. The appearance of the horse when the train first blew the danger signal might not indicate what the horse would do when the train got nearly abreast of him." From this testimony the jury were asked to infer, not that the horse was frightened, but that he would have been frightened if McMurphy had stopped; and having drawn this inference, to further find that it was not negligent to drive on. It was, in substance, allowing the witness to testify that it would not have been prudent to stop. Or, to put it in the form the question went to the jury, it allowed the witness to testify that in his opinion the decedent was not negligent. This was the question for the jury. They were to determine what the average man would do under like circumstances. In that determination they were to use their own average judgment and not the fine-spun theory of some so-called expert. However excellent the judgment of the witness may have been, it could not be used to assist the jury in the discharge of their duties.

We ask that the motion for a nonsuit be granted because of lack of evidence of care on the part of the decedent. The plaintiff's claim, based upon *Lyman* v. *Railroad*, 66 N. H. 200, that in order that the court should grant this motion it must conclusively appear that the plaintiff was negligent, is but another way of stating the rule as laid down in the earlier cases. The motion should be granted when there is no evidence from which it could fairly be found that the plaintiff was in the exercise of due care.

In this case the whole transaction was testified to by an eye-witness. From the testimony it appears that the decedent was driving an old horse over a road he was familiar with; that

while the horse was somewhat afraid of cars, he had never been unmanageable when near them; and that the decedent knew of the approach of the train long before there were any signs of fright exhibited by the horse. An unsuccessful attempt to cross in advance of the train meant certain death. McMurphy needed no time for reflection to reach that conclusion. He was a cattle trader of many years experience. The inexperience of youth cannot be advanced as an excuse for his folly. As the plaintiff says, the situation required the exercise of discretion, judgment, and experience, and the evidence showed that the decedent was one from whom all this could rightfully be demanded. But it does not follow that because this was the situation, the case must go to the jury, no matter what the evidence showed. The exercise of judgment and discretion was an essential part of the plaintiff's case, as it is in every negligence case where the parties are present and acting at the time of an accident. If there is no evidence of the exercise of judgment and discretion, then there is none of the exercise of due care. Under these circumstances and with this duty resting upon him, what did the decedent do? There were many courses open to him. He might stop his horse and control him as best he could while the train passed. This could not have been a difficult feat for one of his skill and experience. The claim that the danger of a runaway accident was of sufficient gravity to justify him in driving in front of a moving train "would hardly be relied upon if the defendant were not a corporation," and would be "regarding that as sufficient evidence to justify an action which would not be so regarded in a suit between two natural persons." *Hanley* v. *Railway*, 62 N. H. 274, 282. Recognizing the force of this position, the plaintiff argues on the theory of what might have happened if the horse had bolted. The sufficient answer to that is that it was shown by the testimony of several witnesses that the decedent had owned this horse for many years, had made a practice of driving him near the cars and over this very street, and that while he sometimes exhibited signs of fright when the cars "came up alongside of him," and was "reasonably afraid," the decedent had always been able to control him. There was, then, no evidence on which to base the claim that McMurphy might reasonably believe the horse would bolt. It was his plain duty to stop. He disregarded that duty, and therefore should not recover damages from the defendants. "To be sure, the statute requires a railroad company to give specified warnings, but it neither takes away a man's senses nor excuses him from using them. . . . The danger may be there, the precaution is simple. To stop, to pause, is certainly safe . . . and if he fails to do so it is of no consequence, in the eye of the law, whether he merely misjudges or is obstinately reckless." *Wilds* v. *Railroad*, 24 N. Y. 430.

But suppose we take them on their own ground, and say that when McMurphy heard the train he properly assumed that the horse would bolt. Suppose he rightfully thought what counsel gravely state in their brief,— that the horse might run over the bank wall and into the train which was to terrify him. Was he for that reason justified in running a race for the crossing?

Let us recall the situation as described by the witnesses. Mc-Murphy was seated in an old-fashioned sleigh, jogging along behind an old farm horse. It was a familiar road, for he had been over it about once a week for many years. When more than a hundred feet from the crossing he heard a train, looked over his shoulder, and saw it approaching from the east. The horse was entirely under control, and showed no signs of fright. If it was dangerous for him to remain in the sleigh why did he not stop and take his horse by the bit? It could have been done in an instant; it is done so frequently as to be no novelty to an experienced driver like McMurphy. The worst that could then have happened would have been a trifling runaway accident, an insignificant injury to an old horse and sleigh. There was ample opportunity for McMurphy to escape all possibility of injury. The fact that other safe means of escape were not at hand is no excuse for his not using those available. The situation was not, as claimed by the plaintiff, one of sudden and unexpected danger. If it was half as bad as it is represented, its perils must theretofore have been so impressed upon McMurphy's mind as to cause him to be on the alert for the approach of a train. It was under these circumstances, with this knowledge and experience, that the decedent saw fit to urge his horse on toward the crossing. He understood what he was doing. He repeatedly applied the whip, and the horse responded to that and apparently took no notice of the train. He took his chances and lost. The rule of law whose aid we invoke is plain and unchallenged. Was this evidence such that a fair and reasonable man could find that the plaintiff was in the exercise of due care? Can it be due care for a man in the full possession of his senses to intentionally drive in front of a moving train, when he might have taken another course by which no harm could come to him? We believe that the law is not so unreasonable as this; and we ask the court to apply here the same rule that it has already applied in the "apparent risk" cases, and to hold that it requires something more than proof of an accident, and of the fact that the defendant is a corporation, to entitle the plaintiff to recover damages.

CARPENTER, C. J. The motion for a nonsuit was properly denied. The speed of the train, the failure to diminish it after McMurphy's situation was discovered, and the absence of a flag-

man were evidence upon which, under proper instructions, the jury might find a want of ordinary care on the part of the defendants.

It was competent for the jury to find that McMurphy was not in fault. Without any misconduct on his part he suddenly found himself in a situation of danger, whatever action he might take. Several alternatives were offered him. He might stop the horse, get out and take him by the bit, and abide the conse- quences of his fright when the train passed him. He might possibly turn about in the narrow pathway at the risk of up- setting. He might perhaps drive the horse over the ridge or bank and upon the side track at a like risk. He could jump out and abandon the horse and sleigh to such fate as might be- fall them. It is plain now that any one of these courses would have been better for him than the one he adopted. With no time to deliberate,—compelled to act upon the instant,—he con- cluded that he could get over the crossing before the engine reached it. He erred by the fraction of a second. If the train had been the tenth of a second later, or the speed of the horse by the least tittle greater, he would have passed the crossing in safety. A mere error of judgment is not necessarily negligence. *Jones* v. *Boyce*, 1 Stark. 493; *Ingalls* v. *Bills*, 9 Met. 1; *Eckert* v. *Railroad*, 43 N. Y. 502, 505, 506. The question was whether a person of average prudence situated as McMurphy was, pos- sessed of the same knowledge and means of knowledge that he had of the surrounding circumstances, including his impending danger and means of avoiding it, would or might have done as he did. It was a question of fact for the jury, to be determined by them in view of their experience in the affairs of life,— their knowledge of the motives that govern human action and of the conduct of reasonably prudent men in similar exigencies. To warrant its withdrawal from their consideration it would not be enough, were such the fact, that the judge at the trial term or the judges at the law term would, if the question were sub- mitted to him or them, find on the evidence that McMurphy was in fault. To justify a nonsuit the court must be able to say that no reasonable and impartial man could find otherwise. The distinction is broad. "Judges may be able reasonably to say frequently that although they would not upon the facts have come to the same conclusion to which the jury have come, yet they . . . cannot say but that reasonable and fair men might agree with the conclusion of the jury; or in other words, that although they would not have arrived at the same conclusion, it is not contrary to reason to arrive at it." *Bridges* v. *Railway*, L. R. 7 H. L. 213, 233. The view taken by the jury of Mc- Murphy's conduct cannot be declared contrary to reason.

The instructions requested were properly refused. If the defendants, by their negligence in not providing a flagman or

otherwise, created the dangerous situation from which McMurphy by due care was unable to escape, they were liable, although after discovering McMurphy's peril they could not prevent the accident. The exception to the instructions given raises substantially the same question as the motion for a nonsuit. It rests upon the defendants' erroneous position that the driving by McMurphy "consciously" upon the crossing in front of the approaching train was conclusive evidence of negligence on his part.

The liability of McMurphy's horse to take fright at the approaching train and to be more frightened when it reached a point directly abreast of him was material on the question whether he exercised ordinary care. The testimony of the witness relative to the behavior of horses when in near proximity to a moving train of cars appears to be the statement of a fact within his personal knowledge derived from experience (*Barron* v. *Cobleigh*, 11 N. H. 557, 566, 567; *Hale* v. *Handy*, 26 N. H. 206, 216), rather than an expression of opinion. In either aspect it was competent. For the purpose of proving the probable behavior of a horse under particular circumstances, the conduct of other horses in the same or a similar situation may be shown. *Darling* v. *Westmoreland*, 52 N. H. 401. It cannot be presumed that all men are so familiar with the conduct of horses when in the vicinity of and in different relative positions from a moving train that they can derive no information on the subject from the opinion of a witness expert in the use and management of horses in such situations. *Barnes* v. *Heath*, 58 N. H. 196; *Donnelly* v. *Fitch*, 136 Mass. 558; *Clinton* v. *Howard*, 42. Conn. 294.

*Exceptions overruled.*

PARSONS, J., did not sit: the others concurred.